We'll call the first case for today, which is Dominion Ambulance v. Edex M. Azar. Mr. Kelly. Good morning. I'm Christopher Kelly, here on behalf of Dominion Ambulance. And we're here today because the Secretary of Health and Human Services has some policies and practices that are inconsistent with federal laws and regulations. Now, the Secretary would like for you to ignore these things and defer to the Secretary's interpretation. Alternatively, the Secretary would like for you to not consider some of the points, because some of the matters have limits to judicial review for some points in some of the statutes. However, where the Secretary's interpretation is clearly inconsistent with federal regulations, and under the circumstances of this case, where the challenges we bring are not within the scope of the limits to judicial review, the issues are And the first thing I'd like to point the Court's attention to is the physician certification statement rule for ambulance transports. The Code of Federal Regulations at 42 CFR 410.40 has two specific sections dealing with non-emergent ambulance transports. Section D.2, dealing with repetitive transports, and Section D.3, dealing with non-repetitive non-emergent transports. Go ahead, sir. In Section D.2, the regs say that an ambulance transport is covered if it's first obtained a physician certification statement saying that medical necessities met. Section D.2, the special rule for non-repetitive non-emergent transports, says that a physician's order can be obtained by a physician, by a nurse, by a discharge planner. It also says that that doesn't have to be done at the time of transport. You can get this certification statement. One thing that is troubling to me about that argument, two things actually. First of all, if you look at the statute, wholly set aside the regulations, the statute still requires medical necessity for the ambulance. And it delegates that to the Secretary, but it seems to me a big stretch to say that the Secretary can delegate the medical necessity determination to a physician 60 days out from a transport. I mean, that to me seems contrary to the statute that any physician without any supervision, no hearing, no oversight, boom, forever binding, that seems to me contrary to the statute. So regardless of what the Secretary might say in regs, it would seem to me that a reg that allowed a physician certification with no questioning, no looking behind it, is absolutely contrary to the statute. So we're not even into deference here. Well, then the regulation shouldn't have been enacted. You're right. And so... But the problem is it is. But if it's contrary to the statute, I don't see how you can rely on it. I don't think it's contrary. I think it's... I do. Well, I think it supplements it. And certainly it puts the... That's it. You can't go behind it. I think that's what the regulation requires. Well, that's not what the statute says. That's where I have the problem. Well, that's what the provider community, though, is on notice of. They're told if you... They're on notice of the statute. And the Secretary can't change the statute. I think that... And if you also, if you look at the history of the notification, it was clear in the what is it, the publications, that this was not to be a delegation of decisional authority to physicians, that it always was subject to oversight as to whether that was a legitimate medical necessity determination. So I don't see how you can say you just look at the letter of the regulation, not at the history, certainly not at the statute. Well, I think part of the history is interesting, too. The Secretary points to a lot of sections in the Federal Register. But most of those deal with Section D3, with the problems about getting a physician certification statement in these non-repetitive transports where you don't really have an attending physician. But there is a section at 64 FEDREG 3641 that says, if the ability to safely transport the beneficiary, given the beneficiary's condition, is at issue, then the supplier may obtain from the physician the necessary documentation supporting the reason for the transport. So I think the Secretary has always intended to relegate this duty, to make the physician statement a type of prescription for care, just like going into your pharmacist with a prescription. The Medicaid statute contemplates that there will always be, regardless of if a physician certified it, there can be a hearing or some sort of oversight. They've never said that you could delegate to a physician who has final authority without any kind of oversight. The statute does not contemplate that in any set of circumstances. I think the statute is silent on it. It says medical necessity. It says medical necessity, but to the Secretary. To be decided by the Secretary, and I don't think they intended the Secretary to delegate that without any kind of oversight to physicians. And I don't think the Federal Register, when this was initially enacted, supports that. Well, again, what I was speaking from the Federal Register, I think it shows the Secretary's intent was to do just that. It may be contrary. That's what it says. We can all interpret it as we interpret it. I think the mere fact that the Secretary put limiting language in Section D.3, where we're dealing with non-repetitive, non-emergent ambulance transportation, shows that there was never an intent to put it and to apply it to Section D.2. And it makes sense. These things are ordered not by a nurse or a discharge planner, but by a physician prior to the ambulance transport. To do that and then to ask an EMT to second guess the medical judgment of a physician is problematic, to say the least. I can't see how an EMT could do that. Again, I liken it to taking your prescription that your doctor gives you into the pharmacy and the pharmacist looking at you and going, man, I don't think you look that sick to me. I'm not going to fill this. That's what we're asking these EMTs to do if we require them to get a physician certification statement and then also require them to ignore it by not transporting the patient, which is fundamentally unfair. The Secretary has set up this system, and I think the Secretary should be stuck with having to deal with the ramifications. I think it's fundamentally unfair to charge the provider with knowledge that is outside of the scope of what the Secretary has published. In addition to the physician certification statement, I'd like to point you to one other problematic section of the statutes. This is part of the Medicare Modernization Act. It's the limitation on the use of extrapolation. This was codified at 42 U.S.C.A. 1395 DDD F3. That says that a Medicare contractor may not use extrapolation unless the Secretary determines that, A, there's a high rate of error, or, B, that documented educational intervention has failed to cure the error. Section B has never been an issue in this case. The issue in this case is, A, whether or not there's a high rate of error that's sufficient to justify extrapolated damages. Now, that section goes on to say that there shall be no review of determinations made by the Secretary of sustained or high rates of error. Now, in this case, there was a determination made that the initial error rate, they only reviewed 40 claims out of a universe of over 12,000. The error rate on those initial claims review was considered high, and therefore they extrapolated damages across the universe of the whole 12,000 claims. We don't challenge that. We cannot. We don't challenge the use of extrapolation in that case. We can't because they jump through the hoop. They may use extrapolation when they make that finding. However, during the appeals process, at every step, claims were found to be payable, so the error rate was changed. The Secretary does not argue that any new error rate was actually noted or that the new error rate was found to be considered still high. However, the Secretary still allowed their contractor to extrapolate the damages. That is clearly inappropriate. In reading their brief, it seemed to me that they took the position that even if you take the allowed claims out, it's still a high rate of error. But there's no such finding. Was your client able to challenge it in the administrative process and say, okay, that whatever the rate remaining is is not high? Were you able to make that argument? We made that argument, but they never ruled on it. They didn't say, yes, it's high, no. They said that, again, there should be no administrative or judicial review of determinations made by the Secretary. Were you able to argue that the methodology was flawed once you took the 14 out of the 40 sample? We made that argument, especially in regard to the claims that were outside the time to reopen. We said that the statistical sampling said you have to pull 30 claims, and you pulled seven of them that you shouldn't have ever had the authority to reopen. So now we've got a smaller sample, and now it's not statistically valid. But, again, they disagreed with us there on the time to reopen issue. But on just the limits to the use of extrapolation and the error rate, we did challenge and say, hey, the error rate has changed. You can't extrapolate again. Is there precedent as to what is a high error rate, sort of the brackets on what's? No. They've specifically declined to set published rates. Where an error rate of 57, 55, 75 has been upheld is a high rate of error? Not that I'm aware of, but also the Secretary has said that a rate of error for one type of provider isn't necessarily comparable to another type. That's one of the reasons they've never set hard lines, you know, 75 percent is high, 50 percent is okay, and 25 percent is low. They've never done that because they said, well, you can't necessarily compare the rates for ambulance service to a heart surgeon to a DME provider. Maybe a high rate of error for one specialty can't be considered high for another. So there's never been anything published. But the issue we have here is that the Secretary admits that, look, we didn't do a determination, but, yes, we extrapolated. And under the clear language of this reg, you cannot extrapolate. It says may not use extrapolation unless there's a determination that there is, not was before, that is a high rate of error. And the Secretary would like for you to not consider that because of this limitation language that determinations made by the Secretary can't be reviewed. The administrative process fell for that. The district court fell for that. What's your best authority that the resulting rate when the allowed claims were taken out of the mix, that the resulting error rate is not high as a matter of law? In other words, do you have authority from prior administrative proceedings, courts, anywhere else that the resulting rate does not come within the high error? All I have is the statute that says that the Secretary must make that determination. And here the Secretary admits that they didn't. Is there any authority that addresses those resulting rate without the? No, there's not. And the Secretary, again, has probably rightfully refused to publish something along those lines. And, again, because there's no judicial review of that specific fact of whether or not an error rate is high, you can't really get to any case law on that point. But what we can create case law, what we can get to, is the fact that no determination was made at all. That's the important point. For example, if it had dropped to 10 percent and they still said it was high, if they made that determination and said, yes, we still think that's high, would I disagree with that wholeheartedly? I think that would be unsupported. Could I challenge that? Could I come here and say, hey, y'all, help me out, 10 percent's not high? I can't do that. Because the reg says I cannot challenge a determination made by the Secretary of a high or sustained error rate. But, again, what I'm challenging here is that the Secretary failed to make that determination. Extrapolation is an exception. It's not the general rule, not after the Medicare Modernization Act. The MMA made extrapolation an exception. The Secretary has to jump through hoops in order to qualify. They have to show that they may use extrapolation because they may not unless there's that threshold finding. And the record is silent on that threshold finding because it doesn't exist. The Secretary admits that no such determination was made. So for that reason, extrapolation simply can't be allowed in this case. It's not supported by the U.S. Code. Especially constitutional issues. Tell us what we need to be considering on that. On the constitutional issue, Your Honor, the district court should have let us bring those issues up for the first time because the administrative process is not appropriate for addressing constitutional issues. Let me ask you about your briefing. It seems to me your briefing only addresses whether the district court should have considered the issue or not. You don't give us any of the merits of the constitutional issue. Is that properly before us then? I think it should be remanded. It should, but should you not have at least argued that there actually is a legitimate issue here? In the reply brief, I think we did point out that the Secretary himself says that, well, the appellant doesn't have a vested interest here because they can still go after the beneficiaries. That is exactly the point. The appellant is entitled to receive money from the beneficiaries for any claim that Medicare denies. The beneficiary is still responsible. However, when you use extrapolation, again, there was 40 claims actually looked at. There's over 12,000 beneficiaries in the universe. We can get the money from those 40, but the other ones, they're unidentified. How can we get money from 60% of the universe? We can't send you a bill and say, hey, we think that you may be in this 60%, so you owe us some money. It's impossible. And for that reason, we do have a vested interest that the due process has completely been destroyed. So thank you. Thank you. May it please the Court, Andrew Rohrbach for the Secretary. I'd like to begin with a colloquy that opposing counsel had with Judge Owen about whether the Secretary intended to delegate the medical necessity determination to doctors 60 days in advance of coverage. And the Secretary certainly did not intend to do that. That's not the way physician certifications generally work within Medicare, as the appeals counsel noted. And that's certainly not what the Secretary intended with these regulations, as the Secretary explained each time it discussed the medical necessity and physician certification requirements for ambulances in the Federal Register. The general rule for ambulance coverage is that the EMTs on the ground are responsible for medical necessity determinations. And in these special circumstances, the Secretary, quote, added, close quote, the requirement of physician certifications to ensure that nonemergency medical coverage was still medically necessary. But when a physician certifies up to 60 days in advance that a service might be medically necessary, that doesn't mean that service on the particular day actually is medically necessary. What is the EMT supposed to do? They do have a doctor's determination that this person can go to dialysis once a week or whatever the situation is. And they show up, and they're sort of betwixt and between. If they don't accept the patient, they could be liable for damages to the patient if something goes south. If they do accept the patient, they could be — they could not get paid. I mean, what do they — how do they, as a practical matter, how does that work? Yeah, I understand, Your Honor. And so I think, first of all, it's important to note that these are not — we're not talking about the emergency cases. So when something happens in an acute case — the same ambulance service comes week after week to pick up Ms. Jones and take her to dialysis. And there's a physician's prescription that says do this. So what does the EMT do when — EMTs are, you know, experienced medical professionals who work on ambulances on a routine basis. And so I think a great example of this is on page 52 of the record. One of the claims the secretary denied is a claim where someone had a physician certification for a heel ulcer and for diabetes. And people — diabetic patients have good days and bad days, and so it's understandable why a physician would certify medical necessity up to 60 days in advance for such a patient. But it's still on the EMT to determine whether on that particular day the person needs an ambulance with an EMT and a separate driver that can provide — that can carry someone on a stretcher if necessary, or whether on that particular day a taxi would be a sufficient form of transportation. There will be close calls, Your Honor, but as a general matter, this is a decision that the EMTs have to make with the physician certification in hand, but also with their experience of the knowledge of the facts on the ground. And it's the kind of thing that the secretary can review. So — So this has not been part of the arguments in the briefing. Was there a common factor or a couple of factors that caused such an enormous percentage of these buildings to be disallowed? I hesitate to say that there was a common factor. I don't think I — My understanding is the secretary says this is not a fraud case, or maybe it's DOJ says this is not a fraud case. Right. We've had two of those this week. But this size of disallowance suggests there's something that the secretary and the process of reviewing these thought the Dominion was doing wrong. And I'm just seeing if you had an answer to, in fact, there were physician certificates on each of these. I mean, I'm assuming that's the category we're in. And, you know, unlike these other cases, no suggestion, I guess, that one physician was pre-clearing all these patients to help Dominion out. So if you don't have an answer, you don't have an answer. Yeah. I'm sorry, Your Honor. I don't have an answer to that question as a general matter. I do think that not all of — not every single one of the claims that were overturned were D-2 claims that had a physician certification. I think some of them may have fallen into the D-3 bucket or just didn't have a physician certification at all. And so I don't — I'm not sure that there's one common threat a opposing counsel might know more about. Well, that gets in, in part, to what Judge Owen is talking about. What is Dominion supposed to do if they're proceeding in a way that seems legitimate with physician certificates? Well, I think it may help, Your Honor, to note that the way Medicare generally works is that billions of claims come in and they're paid very quickly with relatively little upfront medical necessity review. And so, as a general matter, it shouldn't be that unusual for Medicare to audit on the back end and make a determination that, in fact, some of those claims weren't medically necessary and we did pay you for them, but it's time — we now realize that that was erroneous, and it's time to recover the money. That's the deal of Medicare's general operations in this area. So I don't — there doesn't necessarily have to be a kind of fraud situation for that to — for that to make sense. But I do think it's important to note, though, that this is — this is the way Medicare is structured, that these physician certifications are not binding on the secretary. It's also the way that the secretary has explained the physician certification requirement, that the secretary has always retained the right to review — to review the physician medical necessity determinations and the facts on the ground. And I'd — I'd last note, Your Honor, that to the extent that these practical problems exist, they undoubtedly exist today, because since the events in this case, the secretary has expressly revised the regulations to place the burden ultimately on the ambulance company to ensure that the services were medically necessary. The regulations have been revised to expressly state that physician certifications are not binding on the secretary and that the secretary has the right to determine that they were not medically necessary. So these practical problems that opposing counsel in Dominion is pointing out about how the system can't work in the way the government is describing it is, in fact, the way the system is working today and the way the system works in other areas. Another example of this, Your Honor, that the Medicare Appeals Council pointed out is for inpatient hospital services covered under Medicare Part A. For inpatient hospital services, physicians make determinations that a service is medically required, but Medicare nonetheless retains the right to review and ensure that that service was medically necessary before actually making it billable. That's simply, as in most cases, the way physician certifications work, Your Honor. If the Court has no further questions, we ask that the Court affirm the decision of the district. Oh, okay. Okay. Let's say hypothetically that out of the 40 samples that they looked at, it wasn't 14 or 16. 39 of them they decided were covered. So you're now down to 1 out of 40. Would the Secretary still take the position that extrapolation was proper? The Secretary would still take the position that the first-line contractor's decision that there was a high error rate is not the kind of question that the Secretary could review in administrative proceedings or that this Court should judicially review. I think in a case like that, the mathematics would work out in a somewhat different way where the extrapolation amount would be quite low and possibly work to the disadvantage of the Secretary. And I'd also note, Your Honor, that the — Domenion is trying to conflate the actual numerical error rate with the determination that an error rate is high, which is a policy — That's my point. That's my point. In the review process, let's say that originally the error rate is determined to be 95. But after going through the administrative appeals process, it's down to like 2 percent or 3 percent. So it's clearly not high by anybody that I know of's definition. Isn't the provider entitled to say there is — you can no longer use extrapolation because although there was a determination under one set of facts that it was high and it's now conceded the error rate is 1 percent, unless the Secretary is willing to say 1 percent is high, I don't see how you can say that — shouldn't there be some sort of other assertion or finding by the Secretary that the new rate is high? Yeah. You know, I could imagine arguments being made in an appeals process like that, that the extrapolation is inappropriate or doesn't work. Well, that's my hypothetical. What does a court do with that? I don't think a court — We have to accept it's gone from 95 to 1 percent, and we have to accept that that's a high rate of error. Well, certainly that's not this case, Your Honor. But in a hypothetical, yes. Well, I'm asking hypothetical. The Secretary's finding is clearly no longer valid. The way Congress set up the structure of this program is that the high error rate determination is just a screening mechanism made at the threshold and doesn't follow — But doesn't that at least presumptively revoke — isn't the right to extrapolate a presumption? So once you've demonstrated that the error rate was not 95 but, in fact, is 1 percent, could the court say extrapolation was improper? I don't think so, Your Honor, because the regulation — the statute says that the high error rate determination isn't subject to administrative or judicial review. So Congress is trying to separate that from the administrative and judicial procedures. But what about extrapolation? So the — since that finding is, as you said, a requirement in order to use extrapolation, once it's made, the finding doesn't accompany extrapolation through judicial review.  Then can't the administrative process say extrapolation is not appropriate in these circumstances? Is it — you know, I don't — I think as long as the extrapolation is still valid, mathematically valid, I think that — I'm not sure that the Secretary would — But where does the statute say that you cannot review the application of extrapolation? The — I mean — It's — this Court could review if — if Dominion had brought before you its arguments that it made below that the — that the sampling and extrapolation was insufficiently precise, that their expert argued that the sample was incorrectly drawn, those kinds of claims Dominion can bring to the Court for judicial review. It's simply the question of whether the error — there was a high level of payment error or a sustained level of payment error, which is the kind of policy question that Congress has cleaved off from the rest of the judicial review and administrative review processes. So the reason the Secretary couldn't pass on the question of whether there was a high error rate in the sample is because the question was placed before the frontline contractor in the original sampling. And after that point, all that remained was the question of whether the sample was correct, the medical necessity of the claims in the sample, and the — the mathematical and statistical validity of the — But if you find a 1 percent rate of error on appeal down from 95 to 1, the Secretary is still entitled to take 1 percent off 12,000 claims? Well, the — the Secretary would take — if the error rate were — were 1 percent, the Secretary would take less than 1 percent of 12,000 claims because the — the mathematical formula requires the Secretary to take a conservative estimation such that the likely amount of overpayment is — there's a 90 percent likelihood that the true amount of overpayment is greater than the amount that the Secretary is taking. So in a case like that where there's 1 percent overpayment extrapolated across the 12,000 claims and then a conservative estimate is taking, yes, the Secretary would be entitled — I think entitled in that kind of case to take — take that piece of it, but that — that doesn't amount to nearly the kind of situation that we're in here. This is a case where even after — I'm just trying to get ahead of the legal piece of it. Yes, no, I understand, Your Honor. I — I don't think — the reason it's somewhat — that's — you're right that that is the illogical consequence of our position, but I certainly have never seen a case in the course of working on this case where that — that kind of radical material change in the amount of error in the sample rate has been presented to the Secretary or has occurred in the course of the administrative review processes. So it's a little bit of uncharted territory here. The closest case I've seen is Gentiva, the D.C. Circuit case, where in the course of administrative review, I think the error rate dropped from 80-something percent to 20 percent, and the D.C. Circuit said in that case that it couldn't review whether or not the error rate — I mean, this particular challenge wasn't raised, to be clear, Your Honor, whether or not the Secretary had to make a new finding of error, but the D.C. Circuit did say it couldn't review the error rate. I'm just trying to understand how this works. Yes, of course, Your Honor. Your arguments as to how the judicial review process works. Yes, Your Honor. So we think that's how the high error rate piece of this works, that the Secretary is delegated to the ZPIC, the integrity contractor, the determination of whether or not there's a high error rate in the sample, and then the administrative review, as it was here, is focused on whether or not the claims in the sample were medically necessary and whether or not the extrapolation was mathematically sound, but not on whether or not the error rate remains high at each step of the extrapolation. That's how we understand the statute as well. Was there a challenge in this case, the methodology, assuming that the error rate dropped to 65 percent? Does everybody agree to that? Yes. Was there any challenge that that's an invalid extrapolation? Other than the legal arguments that seven claims were included that shouldn't have been. Was there any challenge with the methodology? I believe there was a methodological challenge here. I don't know whether it reached the — whether they brought a challenge to the calculation of the extrapolation or just the drawing of the sample population. I think their claim — I think this is in the ALJ decision that their claim was that the sample needed to be pulled from different parts of their universal claims instead of just one random sample taken. But that is the kind of claim that also is frequently brought in these kinds of proceedings. But they haven't pressed any challenge like that before you. Their challenges before you are simply that the secretary couldn't use extrapolation in this case, that the secretary had to accept the medical necessity determinations of physicians. It's a series of challenges that amount to the argument that the secretary shouldn't have authority to look at their claims, not a challenge to the way the and then conducted the extrapolation. All of that is in line with the statutes and the regulations. Kennedy. Let me ask you about the constitutional claims and specifically dealing with Matthews v. Eldridge. It seems to me that a due process claim addressing the propriety of extrapolation, the application in a particular case, to the extent there's an argument by somebody like Minion that that is a due process violation. That's not something that an administrative agency is going to deal with. It seems to me that there's a legitimate argument that we need to deal with that Judge Cardone was incorrect to say that that needed to be exhausted before the secretary and therefore could not be brought in Federal court. I'm not asking about the merits. I'm asking about whether, in fact, that is an issue that was properly raised for the first time in district court. Yes, Your Honor. I think the issue in Matthews was whether the government needed to provide more process before it could deprive someone of their welfare benefits. And the Court in Matthews said that it was unrealistic to think that the agency would make such a big change to their procedures in one adjudication. The challenges that Dominion is bringing here are challenges to the way extrapolation has been used against them, so the way extrapolation permits them to — or whether or not — I guess let me step back. I think that it is wholly within the secretary's ability to say that it is — Dominion is correct that there needs to be more certainty, for example, in the way extrapolation is being performed in order to ensure that their due process rights are protected. And so the sample size should be larger, or the precision rate in the ultimate outcome should be greater. Those are the kinds of applications of the general principle of extrapolation in light of procedural due process that the secretary could pass on. What case — shot me a case where an agency in any area has ever addressed an issue like that. Well, we cited you the — we cited you cases where the agency has addressed due process cases. We cited — or due process challenges. We cited the Maxim case in our brief, which the district court opinion in Maxim is sort of a little bit opaque about what the exact due process challenge was, but it said that the ALJ in that case accepted a due process challenge and was overturned by the Appeals Council. So we think that this is the kind of challenge that the agency can pass on. And I actually think a better example is their challenge to whether or not — whether or not beneficiary — whether or not they have a right to go after beneficiaries, which we think is an unresolved question that the agency should have the opportunity to pass on in the first instance by application of its various policies. That is — that is very much in line with the heart of what the Supreme Court discussed in Illinois counsel about how there isn't a distinction between constitutional and non-constitutional challenges. The — in a huge government program like Medicare, the agency should have a right  before a court takes a first pass on it and maybe does something that is difficult to square with the way the system as a whole is operating. We do that all the time. No, this Court makes only wise decisions, Your Honor. And we think that — but we think that those decisions point directly in support of the Secretary's position here, which is that these — these claims should have been presented to the agency in the first place. And there's nothing — there certainly is nothing that binds — precludes the agency as a matter of law from deciding the two constitutional challenges that Dominion has brought here. But Matthews is not looking at whether there's anything prohibiting as a matter of law. It's looking at practicalities, is it not? That's true, Your Honor. Which you've already addressed. I'm not — Yeah, I can see that Matthews was focused on practicalities. But the primary argument that Dominion, at least, has brought is that the Secretary is bound by its own — by Decision 86-1 to an outcome on these procedural due process challenges. And we don't think that's correct, Your Honor. So to the extent that it may be — to the extent, as a practical matter, the ALJ or the Appeals Council might be likely to reject at least the particular due process challenges that Dominion is bringing here, that's, you know, one thing, but that's the kind of thing that the agency should be allowed to pass on. And we should see whether or not the agency actually rejects these challenges. But in any event, Your Honor, as we've said, if the court doesn't — if the court actually thinks that these are challenges that the district court should pass on in the first instance, we think the court is free to decide — to affirm on any ground apparent in the record. And we've explained why extrapolation is — has been approved by four circuits, I think, one in the Medicare context and three in the Medicaid context, and that this is a generally accepted form of proof. And so I think this court could reject the due process challenges on the merits if it was uncomfortable with exhaustion holding. Thank you, counsel. We ask that the Court affirm the decision of the district court. I can just pick up where we left off on the constitutional issue. He references Ruling 86-1. The Code of Federal Regs says that CMS rulings are binding on all CMS components that adjudicate matters under the jurisdiction of CMS. So that applies to the entire appeals system. And Ruling 86-1 says specifically sampling does not deprive due process. That's our challenge. So to say that the ruling doesn't apply to the specific challenge we make is nonsensical. It clearly precludes meaningful review in the administrative process because they've already made the decision, which is binding on everyone in the administrative process, that sampling does not deprive due process. Now, the specific argument that we make, I don't think there's any case law on it. He says that it would be nice for the secretary to consider it. Well, the real issue is providers and suppliers have a right to go after beneficiaries for denied claims. There's very limited circumstances where they don't. Those circumstances don't apply here, and there's no allegation that they do. The ambulance service has literally tens of thousands of claims that have been denied in this extrapolated universe. They have no idea which patient they belong to. There's no way to go after those individual patients. That's the due process challenge we make. There's nothing in the administrative process that's going to change that. There's nothing in the administrative process that's going to be able to address it. Again, this ruling precludes it. So I think it was clearly before the district court appropriately. Clearly, I think the secretary misunderstands the substantial interest we have. We're talking about over a million dollars of claims that have been requested to be repaid that we have no idea who the beneficiary is. It is a huge, huge vested interest that the appellant has. So on the constitutional challenge, yes, there's definitely a vested interest that cannot be challenged through the administrative process. On the extrapolation, I appreciate the questions. I appreciate the secretary's, I think, candor in saying, look, we believe that the initial determination that there's a higher error rate supports the use of extrapolation throughout the process. But that's not what the reg says. Well, not the reg. I'm sorry. That's not what the statute says. All we have to do is look at the clear language of the statute. The statute says thou shalt not use extrapolation unless there's a finding that the error rate is high, not was high months ago, maybe in some other probe review that has nothing to do with even the cases at issue. It makes no sense. And we don't have to delve into the actual error rates. All we have to do is look at, okay, did they use extrapolation to calculate the final damage amount? Yes. Did they make a determination that the error rate was high before they made that, did that math and did the extrapolation? The answer is no. If the answer is no to did they do the threshold finding of whether or not an error rate is high, we don't have to get into the error rate itself. How difficult would it have been to do another extrapolation? In other words, if we were to remand this and it goes back to the agency, can the Secretary simply say 65% is high and what we did, we stand by that? Wouldn't that be the result? They could do that. They could. And we couldn't challenge that. But I think the problem is, and this is my area of practice. I do primarily administrative health care law. And I think it's a fundamental problem that the Secretary's basically told all of their contractors, look, you don't have to mess with it. You know, just do that initial threshold finding. I'm just saying, from a court standpoint, if the government is taking a position, which they appear to have done in their brief, that 65% is a high rate of error and that I'm assuming the Secretary authorized them to take that position. We send it back and the Secretary says, I say 65% is high. We stand by the extrapolation. What recourse do you have? It seems like a pointless thing. I don't think remand all the way back to the administrative process is appropriate. I think the Secretary had the obligation and the opportunity to make that finding about the use of extrapolation at that time and failed to do so. I don't see anything that would make remanding all the way back to the Secretary at the beginning of the administrative process appropriate. Where do we remain? All I'm saying is that we say, okay, there's a problem because the Secretary didn't make a finding that 65% is a high rate of error. We reverse and remand to somebody. Eventually you get back into the administrative process and the Secretary says, we stand by the sampling that we did. 65% is high. UOX. Where does it get us? I mean, there are no new facts, no new sampling. I agree. I would ask the Court to reverse, period, without remand. Again, I think the Secretary had the opportunity and the obligation to make that finding prior to the use of extrapolation. What's your best authority that we do that? The statute itself. The statute doesn't say that the case should be remanded. The statute says that the Secretary may not use extrapolation unless there's this finding. They didn't do that at the time they should have. To allow them to go back now. The remand is what the rendition is. I don't see authority to render. Again, I think my position is the statute speaks for itself. Well, if they couldn't have used extrapolation, then we remand for further proceedings, it seems to me. And then they can say, okay, we'll start over or we'll go claim by claim, however they want to do it. I don't see a basis for rendition. Well, again, my position is that the extrapolation is an exception. They didn't meet the requirements to use that exception. And, therefore, extrapolation cannot be allowed. I think that's the end of the analysis. We're just saying extrapolation can't be allowed. They can still recover the actual claims at issue, but they just can't use extrapolation. So I don't think that requires a remand. I think it's just an application of the statute as it's clearly written to the facts at issue. They've admitted that they didn't do. Thank you. Thank you.